# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| ANNETTE COPELAND,<br><br>      Plaintiff,<br><br>      v.<br><br>ARKLAY LLC,<br><br>      Defendant. | Case No. 15-cv-02110 (CRC) |

## MEMORANDUM OPINION

Annette Copeland claims that her former employer, Arklay LLC, discriminated against her because of her race in violation of 42 U.S.C. § 1981. Specifically, she alleges that Arklay terminated her because she is African American, that it maintained a racially hostile work environment, and that it engaged in unlawful retaliation.

No reasonable factfinder could side with Copeland on any of these claims. There is no evidence suggesting that Copeland's termination was racially motivated. Assuming that her coworkers' alleged harassment was sufficiently severe to be actionable, there is no indication that Copeland's supervisor responded to it unreasonably. And because the undisputed facts show that Copeland did not engage in protected conduct, she has no viable retaliation claim. The Court will therefore grant summary judgment in favor of Arklay.

I.    **Background**

Arklay provides network-security support for defense agencies and specializes in assisting those agencies in classified operations. The firm is managed solely by its CEO and owner, Marc Pecot. Pecot hired Copeland in February 2013 to work as a full-time network

administrator, paid hourly. Def.'s Mot. Summ. J. Ex. B ("Pl.'s Dep."), at 22:15–17, 32:9–33:4. During her tenure, Copeland was the company's sole African American employee. Id. 223:7–9.

During Copeland's tenure, Arklay was working on a subcontract with BAE Systems, which in turn was a contractor for the Defense Intelligence Agency ("DIA"). The contract required Arklay's employees to work at the "Threat Mitigation Center," a DIA facility within Bolling Air Force Base in Washington, D.C. Copeland worked in a cubicle in a shared workspace with the four other Arklay employees who were assigned to the BAE subcontract. Her primary responsibility was administering a DIA network called ITACT.

Copeland alleges several instances of workplace harassment while working on the BAE contract. Most of the purported incidents involved two Arklay data engineers, David Chesher and Dean Gull. Copeland's recounts that Chesher "frowned at [her] the whole time" during her job interview, Pl.'s Dep. 215:1, and that Chesher, Gull, and the other employees were generally unwelcoming and excluded her from conversations, id. at 215:2–4, 8–20. She claims to have reported their behavior to Pecot during her first week in a closed-door meeting. Id. at 215:4–11.

Copeland further alleges that, a few months after she was hired, Chesher—who sat in a nearby cubicle—temporarily locked her out of the ITACT network. Copeland reported this incident to Pecot in an email dated June 6, 2013. Pl.'s Dep. Ex. 19. In that message, Copeland implicated Gull in the lockout scheme. Id. at 1. She also mentioned that the pair would often look at her computer screen—apparently Gull was "constantly peering over the cubicle or standing and staring over at [her] screen." Id. At the end of the message, Copeland proffered a motive for her coworkers' actions:

> Dean [Gull] and Dave [Chesher] have made it known in the office that I don't know what I am doing. Which is quite insulting. Whenever they talk about me, they do it openly in front of [other employees.] So, I take it they want me out of there, especially Dean. And what he wants, he gets. That's how I've seen it.

2

Id. Ex. 21. As Copeland explained in her deposition, she did not indicate to Pecot that Gull or Chesher were motivated by her race. Pl.'s Dep. 155:9–21.

Pecot responded to Copeland's message a few hours later, explaining that he suspected the lockout was merely a system error, but indicating that he would investigate further if the same problem happened again. Id. Ex. 21. Pecot later explained in his deposition that users, including him, were regularly locked out of the system. Def.'s Mot. Summ. J. Ex. F, at 98:7–21. As to Copeland's accusation that Gull and Chesher sought to undermine her, Pecot explained that he had found the team "reasonable and considerate" and that no one had approached him with "issues regarding [her] performance." Pl.'s Dep. Ex. 21. Pecot was willing to approach the team about an "uncomfortable working environment," but, noting that Arklay had only six days left working on the BAE contract, he expressed hesitation to use those final days "focusing our efforts to resolve a team dynamic that will shortly become irrelevant." Id.

The BAE contract ended in June 2013, and Arklay furloughed its employees for about three weeks while Pecot sought more work for the company. Def.'s Mot. Summ. J. Ex. A ("Pecot Decl."), at ¶ 17; Pl.'s Resp. to Stmt. Material Facts ¶ 51. In early July, Arklay obtained a subcontract with another DIA contractor. Pecot assigned Copeland to be the network administrator for this contract. For the first few weeks of the contract, Copeland, Chesher, Gull, and two other employees worked at Bolling, in the same location as they had for the BAE contract. The DIA then decided to relocate the operation to a new facility in Landover Maryland. On August 28, Copeland told Pecot by email that she "will not be moving with you all to the [new facility]" because the Maryland facility was "much too far, [and] even if I took trains it would take me too long to get to my daughter in an emergency." Pl.'s Dep. Ex. 5. She formalized her resignation the next day. Id. Ex. 4. In response, Pecot said that he understood her

3

decision and offered that, if she did not have another job lined up, she could work part-time work until her replacement began. Id. Ex. 9. Copeland accepted, and Pecot told her that, while part-time employees typically were ineligible for health insurance, he would maintain hers so that she did not "have to worry." Id. Ex. 10.

Copeland worked for Arklay part-time beginning August 29, 2013. Pl.'s Dep. 57:17–58:13. During some of this period, Pecot allowed Copeland to work remotely at a facility in Reston, Virginia, which was nearer to her home. Pecot Decl. ¶ 25. Pecot also gave her a substantial raise—from $62.50 to $70.30 per hour—because her part-time status reduced Arklay's overhead costs. Pl.'s Dep. Ex. 14.

Copeland alleges further incidents of harassment during this period of part-time work. Her primary accusation is that Gull and Chesher regularly peered at her monitor and continued to interfere with her access to the computer systems. Pl.'s Dep. 38:18–39:20. She did not report these incidents to Pecot. Id. 101:15–102:20. Rather, she claims that in October she informed Pamela Prewitt, a government employee who worked at the DIA facility, and enlisted Prewitt's help to try to catch the pair hacking into her system on subsequent occasions. Id.; see also Pl.'s Opp. Ex. 1, at 6 (EEOC letter). Copeland believes that Pecot was aware of her decision to report Gull and Chesher's behavior to Prewitt, though she acknowledges that she did not herself inform Pecot of that fact. Pl.'s Dep. 162:19–163:3.

Pecot originally planned to terminate Copeland's position that November, but, finding that he had billable hours to fill due to other employees' vacations, he asked Copeland to stay on until those hours were exhausted. Pecot Decl. ¶ 29. By July 2014, those hours were complete, and Pecot informed Copeland that her last day with the company would be September 20, 2014—the last day of Arklay's DIA subcontract. As Pecot explained in a July 31 email to

4

Copeland, the position of network administrator was being eliminated at the end of the current contract. Pecot Decl. Ex. 5.

A few months after her tenure with Arklay ended, Copeland filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Arklay discriminated against her on the basis of race and sex, and that it engaged in illegal retaliation. Pl.'s Opp. Ex. 4; see also id. Ex. 1. After receiving a right-to-sue notice from the EEOC, Copeland filed this action. Compl. ¶ 26. Arklay moved for summary judgment, and the motion is now ripe for adjudication.

## II. Standard of Review

Granting a motion for summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court must accept as true the nonmovant's evidence and draw all reasonable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The nonmovant may not, however, rely on "mere allegations" or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III. Analysis

### A. Title VII Claims

Though Copeland originally brought claims under both Title VII and 42 U.S.C. § 1981, she now concedes in her opposition to Arklay's motion that Arklay did not employ more than fifteen people in any month during the years of her employment, and thus does not qualify as an "employer" for purposes of Title VII. 42 U.S.C. § 2000e(b); see Pl.'s Opp. 10–11; Pl.'s Resp. to

5

Stmt. Material Facts ¶ 110. The Court will therefore grant summary judgment for Arklay with respect to Copeland's claims under Title VII.

**B. Section 1981 Claim**

Copeland's remaining claims are those brought under 42 U.S.C. § 1981, which protects the right of "[a]ll persons" to "have the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a). An employer violates § 1981 if it discriminates on the basis of race in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b); see Carney v. Am. Univ., 151 F.3d 1090, 1092–93 (D.C. Cir. 1998).

Copeland alleges that Arklay violated § 1981 by (1) terminating her because of her race, (2) maintaining a hostile work environment because of her race, and (3) retaliating against her for the exercise of statutorily protected conduct with respect to race-based discrimination. The Court will address these allegations in turn.

1. Discriminatory Termination

Copeland alleges that she was terminated from her position based on her race. Compl. 6 (Count V). In evaluating these sorts of discrimination claims under § 1981, courts use the three-step framework established for race-discrimination claims under Title VII. See Carney, 151 F.3d at 1092–93 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973)). First, the plaintiff must make a prima facie case by establishing that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) "the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of [her] membership in the protected class)." Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002). The burden then shifts to the employer "to articulate 'some legitimate, nondiscriminatory

reason' for the employment action, which the plaintiff can rebut by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination." Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (quoting McDonnell Douglas, 411 U.S. at 802–04). "Although the burden of persuasion always remains with the plaintiff, to survive summary judgment the plaintiff need only raise a genuine issue of material fact with respect to each element of the McDonnell Douglas framework." Carney, 151 F.3d at 1093.

The D.C. Circuit has explained that, where an employer at the summary judgment stage asserts a legitimate, nondiscriminatory justification for an adverse action, "the question whether the employee actually made out a prima facie case is 'no longer relevant.'" Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)). Rather, a court in that posture "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" Id. at 494.

Here, Arklay has asserted a legitimate, nondiscriminatory reason for terminating Copeland: it is undisputed that her temporary position was eliminated. Pecot Decl. Ex. 5; Pl.'s Resp. to Stmt. of Material Facts ¶ 104. And assuming that Copeland has made out a prima facie case of discrimination, she has not produced sufficient evidence for a reasonable juror to conclude that this nondiscriminatory reason was pretextual.

A plaintiff can create a material dispute of fact as to pretext in a variety of ways. If Copeland could introduce *direct* evidence that race really drove the decision—for example, a racially charged comment—her claim would almost certainly survive summary judgment.

7

See, e.g., Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013). Copeland concedes that no such evidence exists here. See Pl.'s Dep. 222:11–19.

A plaintiff can also sustain a discrimination claim against an employer's assertion of a nondiscriminatory reason using circumstantial evidence—for example, evidence undermining the employer's proffered reason or showing an employer's generally biased attitude. See Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006). The record here contains no such evidence. Indeed, Copeland in her deposition offers an express concession that Pecot did not terminate her because of her race. In Copeland's view, Pecot was "upset that I spoke with Pam [Prewitt], and had Pam to catch Dave Chesher hacking me," Pl.'s Dep. 218:15–17, because it showed that Copeland "wasn't a team player," id. 219:11–12. This accusation sounds in a theory of *retaliation*, not race-based discrimination (though, as explained below, it is not sufficient evidence of illegal retaliation either).

In any event, insofar as Copeland relies on her *coworkers'* alleged misconduct to imply bias on *Pecot's* part—absent any evidence of Pecot's bias—she invites the factfinder "to go far beyond reasonable inference and into the realm of unfettered speculation." Holcomb, 433 F.3d at 901; cf. Dunaway v. Int'l Brotherhood of Teamsters, 310 F.3d 758, 764–66 (D.C. Cir. 2002) (in reversing summary judgment for employer, noting that plaintiff's supervisor had made derogatory comments to employees); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1299–1300 (D.C. Cir. 1988) (en banc) (in finding that record supported pretext, focusing on inconsistency between employer's explanation that applicant was unqualified and employer's actual treatment of applicant). Thus, the Court will grant summary judgment against Copeland's claim that she was terminated because of her race.

2. Hostile Work Environment

Copeland also contends that Arklay maintained a hostile work environment because of her race. Specifically, she alleges that her coworkers harassed her by locking her out of her computer system and generally giving her the cold shoulder, and that Pecot did not adequately police their behavior. Pl.'s Opp. at 12.

To prevail on a hostile work environment claim, the plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment, and (5) the employer may be held liable for the harassment. See Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1122–23 (D.C. Cir. 2002). To be actionable, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Ayissi-Etoh, 712 F.3d at 577 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

Here, even assuming that Copeland could show sufficiently severe or pervasive harassment, and that the harassment was driven by race—two long-shot assumptions, given the record—no reasonable factfinder could conclude that Arklay was liable for that harassment. As the Supreme Court has explained in the Title VII context, "an employer's liability for such harassment may depend on the status of the harasser." Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013). "If the harassing employee is the victim's co-worker," as opposed to her supervisor, "the employer is liable only if it was negligent in controlling working conditions." Id. The alleged incidents of harassment here were perpetrated by Copeland's coworkers, not her supervisors, and thus Arklay can be liable for that harassment only if it "knew or should have

9

known of the harassment and failed to implement prompt and appropriate corrective action." Curry v. District of Columbia, 195 F.3d 654, 660 (D.C. Cir. 1999).

Copeland admits that she informed Pecot of the alleged lockout and snooping only in one instance: her May 2013 email. Pecot responded that he would be willing to investigate if it occurred again, but that he believed the lockout was the result of a system error. He reiterated in his deposition that the problem happened regularly and thus that a network lockout raised no red flags. Moreover, in her message to Pecot describing the lockout incident, Copeland made no hint that Chesher or Gull were motivated by racial bias—only that she suspected that they believed her to be incompetent. The same is true of the closed-door meeting where Copeland apparently told Pecot that none of her coworkers were willing to show her around the office.

Section 1981, like Title VII, does not impose a generalized duty on employers to police the social conditions of the workplace. See Oncale v. Sundowner Offshore Servs., Inc., 525 U.S. 75, 81 (1998). Rather, Arklay can be held vicariously liable for coworkers' harassment only if it ignored conduct that it perceived (or reasonably should have perceived) as violating § 1981, and nothing in Copeland's communications to her supervisor raised the specter of unlawful bias. As a result, no reasonable factfinder could believe that Pecot unreasonably handled Copeland's reports about her coworkers' behavior. The Court will grant summary judgment in favor of Arklay on Copeland's hostile work environment claim.

   3. Retaliation

Finally, Copeland alleges that Arklay terminated her in retaliation for taking actions protected by statute. To establish a prima facie case of retaliation, Copeland must show that she "engaged in protected activity—such as filing an EEOC complaint—and that [her] employer took an adverse employment action against [her] because of that activity." Ayissi-Etoh, 712

10

F.3d at 578. If, for example, an employee complained to her supervisor about race discrimination, it would be unlawful for the employer to respond by firing her. See Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

Nothing of the sort happened here. There is no plausible allegation, let alone evidence, showing that Copeland engaged in protected activity. Copeland's EEOC complaint was filed several months after her termination. Compl. ¶ 26. She did tell Pecot in May 2013 that Chesher and Gull locked her out of the network and were unkind toward her. But "[w]hile no 'magic words' are required" to render an internal complaint protected, "the complaint must in some way allege unlawful discrimination, not just frustrated ambition." Broderick, 437 F.3d at 1232. No reasonable factfinder would think Copeland's description of her coworkers' conduct suggested unlawful harassment.

Similarly, Copeland's decision to inform Pamela Prewitt of Chesher and Gull's alleged behavior was not protected. Prewitt was a DIA employee with no employment relationship to Arklay. Even if Pecot was aware of Copeland's decision to report her coworkers to Prewitt, nothing that she reported would plausibly suggest to Pecot that she was complaining about race-based harassment. The Court will grant summary judgment against Copeland's claim that Arklay engaged in unlawful retaliation.

## IV. Conclusion

For the foregoing reasons, the Court will grant [25] Defendant Arklay LLC's Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 19, 2017